IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:23-CV-578-FL

| | | |
|---|---|---|
| JAMES BLACKMON, by and through his guardian of the estate, Paul Truett Canady, II, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) ) | ORDER |
| JAMES HOLDER, in his individual capacity, ANDREW MUNDAY, in his individual capacity, and the CITY OF RALEIGH, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court upon defendants' motions to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (DE 11, 16, 17). Defendants' motions have been briefed fully, and in this posture issues raised are ripe for ruling. For the following reasons, defendants' motions are granted.

## STATEMENT OF THE CASE

Plaintiff began this constitutional tort suit October 16, 2023. However, this case has a lengthy procedural history, because it follows a substantially similar action between these parties filed in this district October 5, 2020, bearing case number 5:20-cv-524 (the "2020 suit").

Defendants' motions to dismiss the 2020 suit were granted in part July 8, 2021. The court dismissed without prejudice the individual capacity claims against defendants Andrew Munday and James Holder, who are former Raleigh Police Department ("RPD") officers (together, the "officers"), permitted other claims against them and the City of Raleigh (the "city") to proceed,

and gave plaintiff 21 days to move for leave to amend his complaint. Plaintiff did so, and the court denied that motion February 3, 2022. While the court was considering the motion for leave to amend, James Blackmon ("Blackmon") died January 13, 2022.[1]

Plaintiff, unable to engage defendants in a stipulation of dismissal pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii), moved to dismiss its remaining claims without prejudice in the 2020 suit, to provide time for counsel to consult with the estate's administrator and Blackmon's heirs about what course to pursue. (See Mot. Dismiss, Canady v. Holder, No. 5:20-cv-524 (E.D.N.C. Apr. 25, 2022) [hereinafter "2020 Suit"], DE 72). Before the court ruled on that motion, plaintiff commenced a separate lawsuit in state court based on the same facts on June 13, 2022. (See generally Complaint, Est. of Blackmon v. Holder, No. 22-CVS-7094 (N.C. Super. Ct. June 13, 2022) ("State Compl.")). On August 4, 2022, plaintiff also noticed an appeal of the court's July 8, 2021, dismissal order, among others, in the 2020 suit. (Notice of Appeal (2020 Suit DE 80)).

The court granted plaintiff's motion for voluntary dismissal July 8, 2022, (Order (2020 Suit DE 99), and so in considering the appeal, the United States Court of Appeals for the Fourth Circuit ordered supplemental briefing on whether plaintiff's voluntary dismissal of certain claims without prejudice had created a split judgment not properly subject to appellate review. (See Order, Canady v. Holder, No. 22-1824 (4th Cir. Mar. 30, 2023) [hereinafter "2020 Suit Appeal"], DE 35). Plaintiff conceded a lack of appellate jurisdiction, (see generally Suppl. Br. (2020 Suit Appeal DE 37)), and the Fourth Circuit dismissed the appeal and remanded the case to this court, "for . . .

---

[1]    All references in this order to "plaintiff" refer to the natural person James Blackmon ("Blackmon"), or to his estate, as appropriate based on timing of the particular event. References to "Blackmon" are to the natural person and his historical actions.

2

further proceedings, if any, as appropriate." <u>Canady v. Holder</u>, No. 22-1824, 2023 WL 3863091 (4th Cir. June 7, 2023).

On remand, plaintiff again moved for leave to amend the complaint. (Mot. Leave Amend (2020 Suit DE 91)). This court denied that motion September 27, 2023, on grounds that it lacked jurisdiction over the case following its grant of plaintiff's motion for voluntary dismissal. (Order (2020 Suit DE 99)). Plaintiff noticed a second appeal of various orders, including the July 8, 2021, dismissal order, on October 25, 2023, which appeal remains pending. (Notice of Appeal (2020 Suit DE 100)).

In the meantime, plaintiff filed complaint in the instant action October 16, 2023. In extensively detailed pleading, plaintiff asserts the following four causes of action against the officer defendants: 1) fabrication of false statements in violation of the Due Process Clause; 2) coerced confession in violation of the Due Process Clause; 3) conscience-shocking interrogation techniques in violation of substantive due process; and 4) malicious prosecution and inadequate investigation in violation of the Fourth Amendment. Plaintiff includes a fifth, municipal liability claim for failure to train, supervise, and discipline against the city. Plaintiff seeks compensatory and punitive damages, as well as fees and costs.

All three defendants, who comprise the officers and the city, filed the instant motions to dismiss during December, 2023. Plaintiff responded in opposition, and defendants replied.

**STATEMENT OF FACTS**

The facts alleged in the complaint are as follows. Blackmon was a natural person who, prior to his death, was legally incompetent at all relevant times. (Compl. (DE 1) ¶ 13). The defendant officers were detectives with the RPD assigned to investigate the 1979 murder of Helena Payton ("Payton"). (<u>Id.</u> ¶¶ 14–15).

3

Payton was a student at St. Augustine's College ("SAC") in Raleigh in 1979. (Id. ¶ 58). On September 29, 1979, she left her dorm in an all-female building to use the bathroom, and was attacked inside the bathroom by a man wielding a knife. (Id.). The attacker cut Payton's neck severely, and she ultimately died from the wound. (Id.). Several other women on Payton's floor awoke to Payton's screams, and saw a man walking out of the bathroom, down the hall, and down the stairs; one witness, Jackie Kelly ("Kelly"), saw the man walk "right past her" on his way out. (Id. ¶ 60). RPD processed the crime scene the same day, which included lifting latent fingerprints from the bathroom. (Id. ¶ 61).

Despite significant publicity and community concern, RPD was unable to solve Payton's murder. (Id. ¶¶ 63–64). The officers were assigned to lead the investigation sometime between February 3, 1981, and January 18, 1982. (Id. ¶ 65). They were also unable to solve the crime, and had come under significant public and media pressure by February, 1983. (Id. ¶ 67).

That month, another RPD detective received an uncorroborated tip from an unidentified person who claimed to be at Dorothea Dix State Psychiatric Hospital ("Dix"). (Id. ¶ 68). The tipster claimed that a black, male patient in a particular wing at Dix had been bragging about killing women in New York, New Jersey, and Raleigh. (Id.). RPD had no information speaking to the tipster's credibility or history, but learned that Blackmon was the only subject in the identified wing at Dix who fit the physical description given. (See id. ¶¶ 69–71). The officers learned this information sometime in February, 1983. (Id. ¶ 74).

The officers obtained copies of Blackmon's medical records from Dix and New York facilities, which established that Blackmon had been diagnosed with schizophrenia and other mental illnesses, and that he had an IQ of 69, together resulting in "significant intellectual disabilities." (Id. ¶¶ 77–79).

4

Before meeting Blackmon, the officers learned various pieces of exculpatory information about Blackmon. They had Blackmon's fingerprints compared to the latent prints lifted from the bathroom at SAC; Blackmon was excluded as the source of these prints. (Id. ¶ 82). They also learned that Blackmon had been arrested in upstate New York a month before, and again five weeks after, the murder, and that he had no car and could not drive. (Id. 83–85). Further, no witness in North Carolina placed Blackmon in this state any earlier than the summer of 1981, two years after the murder. (Id. ¶ 86). Next, the officers learned that Kelly described the perpetrator as clean-shaven, though Blackmon wore a beard. (Id. ¶¶ 88–90). Finally, Kelly also failed to identify Blackmon as the murderer in a photo lineup. (Id. ¶¶ 91–92).

The officers then interrogated Blackmon. During these sessions, they "intentionally exploit[ed] Blackmon's mental illness" to allegedly cause Blackmon to make false inculpatory statements, such as by convincing Blackmon to adopt their own suggestive statements, and by asking leading questions. (See id. ¶¶ 95–115). Next, the officers changed Blackmon's appearance in an attempt to induce Kelly to identify Blackmon as the perpetrator in a live lineup. (See id. ¶¶ 116–22). Despite this, Kelly responded "this does not look like the guy that I described[.]" (Id. ¶ 121). The officers concealed this lineup and Kelly's exclusion from the RPD, and from the district attorney. (See id. ¶¶ 127–28).

The officers eventually arrested Blackmon for the murder December 7, 1983. (Id. ¶ 131). During the ensuing criminal proceedings, Blackmon "firmly asserted his innocence," and ultimately entered an Alford plea after unsuccessfully moving to suppress his statements to the

officers.  (Id. ¶¶ 132–38).[2]  Blackmon refused to admit his actual guilt during his plea colloquy.  (Id. ¶ 138).

Beginning in 2018, police obtained several pieces of evidence suggesting that another man, who died in 2008, had murdered Payton.  (See id. ¶¶ 141–52).  In January 2019, a three-judge panel convened by the North Carolina Innocence Inquiry Commission concluded that Blackmon was factually innocent of the crime, and exonerated him.  (Id. ¶ 11).  By that time, Blackmon had spent more than 35 years in prison.  (Id. ¶ 155).

## COURT'S DISCUSSION

A.    Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).[3]  "Factual allegations must be enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555.  In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments."  Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).

---

[2]     A defendant's plea entered under North Carolina v. Alford, 400 U.S. 25 (1970) admits legal guilt for plea purposes, but maintains the defendant's factual innocence.  See United States v. King, 673 F.3d 274, 281 (4th Cir. 2012).

[3]     Throughout this order, internal quotation marks and citations are omitted unless otherwise specified.

B.     Analysis

Defendants together argue that this action must be dismissed on statute of limitations grounds, that the officers are entitled to qualified immunity, and that the court should abstain from jurisdiction under the Colorado River doctrine and the first-to-file rule. The court rejects the latter two contentions, but agrees with the first two in part.

1.     Statute of Limitations

The parties clash at the outset over the statute of limitations applicable to this case. Defendants argue that this entire suit is untimely, while plaintiff contends that a combination of North Carolina tolling doctrines saves plaintiff's claims. Specifically, plaintiff argues that the limitations period was tolled during the pendency of the first suit, and during the pendency of plaintiff's appeal and two motions for leave to amend. The court agrees. Defendants counter that even so, some of plaintiff's claims remain untimely because they were not raised in the first suit. The court agrees with this point as well.

a.     General Principles and Common Ground

The court begins by briefly recounting general statute of limitations principles under § 1983, and the operation of the North Carolina tolling doctrines the parties agree apply here.

Because § 1983 lacks its own statute of limitations, courts use the statute of limitations applicable to personal injury actions in the underlying state. Tommy Davis Constr., Inc. v. Cape Fear Public Utility Auth., 807 F.3d 62, 66–67 (4th Cir. 2015). In North Carolina, the § 1983 statute of limitations is therefore three years. Id. at 67. Section 1983 also incorporates the relevant state's tolling rules. See Hardin v. Straub, 490 U.S. 536, 539 (1989).

Applying these general principles, the parties agree on several points. First, that plaintiff's claim accrued, for statute of limitations purposes, when Blackmon was exonerated August 22,

2019.  (See Holder Br. Supp. (DE 12) 6); see generally Heck v. Humphrey, 512 U.S. 477 (1994) (barring § 1983 claims that impugn a state criminal conviction unless and until that conviction is overturned pursuant to state processes or federal habeas).  Second, that Blackmon was incompetent under North Carolina law at all relevant times, and so the limitations period here began to run only upon appointment of a guardian November 25, 2019.  (See Holder Br. Supp. 7).  Third, that Blackmon's death in January, 2022 extended the limitations period for his estate until January 13, 2023.  (See id. 7).  Defendants argue that the limitations period expired that date, rendering plaintiff's October 2023 complaint untimely.

> b.    Fink and Ingram Tolling

Plaintiff contends that the complaint here is timely through the application of two other North Carolina tolling rules.  The court agrees.

First, plaintiff argues that the limitations period remained tolled during the pendency of the first suit.  (See Pl's Br. (DE 23) 8–9).  Under North Carolina law, an action's limitations period remains tolled during the pendency of a properly initiated suit.  See B-W Acceptance Corp. v. Spencer, 268 N.C. 1, 8 (1966); Long v. Fink, 80 N.C. App. 482, 485 (1986); see also Lee ex rel. Shelton v. City of Fayetteville, No. 5:16-cv-759-FL, 2017 WL 2274970, at *5 (E.D.N.C. May 24, 2017).  So, the period for plaintiff's claims against the officers here was tolled from October 5, 2020, when plaintiff filed the 2020 suit, to July 8, 2021, when this court dismissed his claims from that complaint.  Thus, 780 days remained in the period as of July 8, 2021.  (See Pl's Br. 9).  The officers substantially concede this point in their joint reply brief.  (See Reply Br. (DE 24) 1).

Next, plaintiff argues that equitable tolling applies here, to toll the limitations period during the two periods in which plaintiff's motions for leave to amend were pending, and during plaintiff's appeal.  (See Pl's Br. 10–14).  The court agrees that such tolling should apply at least to the

pendency of the first motion for leave to amend, and therefore does not reach the other two spans plaintiff argues should be tolled.

Plaintiff's argument revolves around Aikens v. Ingram, 524 F. App'x 873 (4th Cir. 2013). Though unpublished, this opinion of the United States Court of Appeals for the Fourth Circuit includes a thorough analysis of equitable tolling under circumstances very similar to those here, and has not been called into question by any later published decision, so the court relies upon it as persuasive authority.

In Ingram, the Fourth Circuit recognized that no controlling North Carolina decision expressly addressed equitable tolling. See id. at 881. But it concluded, based on an extensive analysis of related North Carolina doctrines and tolling jurisprudence from other jurisdictions, that the Supreme Court of North Carolina would adopt equitable tolling, and would consider whether 1) defendants have received timely notice of plaintiff's claims; 2) defendants have been prejudiced by delay in litigation; and 3) plaintiff acted diligently. See id. at 880–83; Pa. Nat'l Mut. Cas. Ins. Co. v. Beach Mart, Inc., No. 2:14-cv-08-FL, 2022 WL 4709249, at *11 (E.D.N.C. Sept. 30, 2022) (applying this test); Staffing Advantage LLC v. Definitive Staffing Sols., Inc., 7:20-cv-150-M, 2021 WL 2426340, at *7 (E.D.N.C. June 14, 2021) (same).

Ingram applied this test to circumstances very similar to those presented here. In that case, the plaintiff timely filed complaint, but the district court dismissed the action without prejudice for failure to exhaust administrative remedies. See Ingram, 524 F. App'x at 875. The pertinent administrative body itself determined that it lacked jurisdiction, so that no exhaustion was required. See id. at 876. The plaintiff then moved under Federal Rule of Civil Procedure 60(b) for relief from the district court's dismissal order, which request the court denied seven months later. See id. at 876. After this ruling was affirmed on appeal, the plaintiff immediately filed a new action

9

reasserting the same claims, which the district court dismissed on statute of limitations grounds. See id. at 877. On that history, the Fourth Circuit concluded that plaintiff's actions had met its equitable tolling test, so that the limitations period on his claims had been tolled while his Rule 60(b) motion was under consideration by the district court and on appeal. See id. at 883–84.

The court concludes that Ingram's analysis is applicable to this case. First, plaintiff timely moved for leave to amend his complaint following the court's July 8, 2021, dismissal order. There is no dispute, except that discussed below, that defendants generally received timely notice of plaintiff's claims common across the 2020 and present suits, and defendants' only argument on prejudice is about general passage of time, which is insufficient. (See Holder Br. 10 n.3); EEOC v. Radiator Specialty Co., 610 F.2d 178, 183 (4th Cir. 1979) (ruling such general arguments insufficient to support a laches defense). Instead, defendants merely argue that plaintiff's actions were not reasonable or diligent because the court ultimately denied plaintiff's motion for leave to amend. The court cannot agree. Ingram requires only "reasonabl[e]" diligence and, in that case, the Fourth Circuit held the plaintiff's actions reasonable despite the district court's eventual decision to deny his Rule 60(b) motion. See id. at 883–84.

Next, defendants point out that in Ingram, the district court affirmatively indicated to the plaintiff that he "may return to federal court" if his administrative proceedings were unsuccessful. Id. at 875. But the court's dismissal order here expressly allowed plaintiff 21 days to move for leave to amend. (See Order (2020 Suit DE 38) ("2020 Order") 19). Although less explicit than the court's statement in Ingram, this ruling, too, signaled to plaintiff that the door might remain open to his claims.

Further, defendants argue that the standard for equitable tolling announced in Menominee Indian Tribe of Wis. v. United States, 577 U.S. 250 (2016), should apply. (Reply Br. 4). The court

disagrees. That case announced a demanding standard for equitable tolling under general federal law. Id. at 255. But here, the court applies North Carolina's tolling law, both generally, and as announced in Ingram. See Cape Fear Public Utility Auth., 807 F.3d at 66–67; Ingram, 524 F. App'x at 883; Staffing Advantage LLC, 2021 WL 2426340, at *7.

Finally, defendants point to the fact that most of the Fourth Circuit in en banc consideration of Ingram's appeal agreed that the district court could have allowed his Rule 60(b) motion. (See Reply Br. 3). This observation is of questionable relevance and unconvincing alone. At bottom, the court perceives no meaningful difference between Ingram and this case.

Under Ingram, plaintiff's limitations period therefore was tolled between plaintiff's corrected motion for leave to amend on July 30, 2021, and the court's order denying the motion February 3, 2022. This tolls the limitations period from August 27, 2023, to March 2, 2024.[4] Plaintiff's October 16, 2023, complaint therefore was timely, except as discussed below. Because the court concludes that Fink and this first round of Ingram tolling apply here, it does not reach whether Ingram tolling applied through plaintiff's appeal of the court's dismissal order, or to the period during which the court considered plaintiff's second motion to amend.

> c.     Claim-Specific Untimeliness

As a fallback argument, defendants argue that even if the complaint generally is timely, certain claims are not because they did not appear in the 2020 complaint. (See Reply Br. 5). Under Ingram, defendants must have received timely notice of plaintiff's claims. See Ingram, 524 F. App'x at 883. Defendants argue they lacked timely notice of certain claims, specifically counts two and three of the 2023 complaint, and one of the theories underlying counts one and four,

---

[4]     After applying Fink tolling as discussed above, plaintiff had 780 days remaining in the period as of July 8, 2021, which therefore did not expire until August 27, 2023. Then, 188 days were tolled between July 30, 2021, and February 3, 2022, extending the period again to March 2, 2024.

because they were not presented in the 2020 complaint. (See Reply Br. 5). The court agrees only as to one of the theories underlying counts one and four.

The court turns first to what defendants label the "investigative notes fabrication" theory. (Reply Br. 5). Counts one and four of the 2023 complaint rest, in part, upon fabrication of evidence claims premised on two theories: 1) that the officers outright manufactured and attributed statements to Blackmon that he never made, and 2) that using manipulative interrogation techniques on a severely mentally ill subject means the statements they convinced Blackmon to make amount to fabricated evidence. (See Compl. ¶¶ 103–04, 113–15, 130, 159–61, 167, 170–71, 215–20). Defendants argue that the former theory is untimely because it never appeared in the 2020 complaint, meaning they never received timely notice of it under Ingram. Because Ingram and the little authority applying it are not entirely clear on the details of this requirement, the court consults authority from the closely analogous context of relation back of pleadings to illuminate the meaning of Ingram's notice element. On these grounds, the court agrees with defendants.

The 2020 complaint contains factual allegations that the officers' notes were inconsistent with Blackmon's statements, but it did not assert fabrication, and the 2020 complaint's fabrication claim instead rested entirely on the latter theory described above. (See Compl. (2020 Suit DE 1) ("2020 Compl.") ¶¶ 151–54, 191–92, 253–56, 266, 269–73, 282, 292–95). The investigative notes theory is therefore not entitled to Ingram tolling, because even if defendants receive timely notice of a fabricated evidence claim, through the headings attached to the relevant count in each complaint, they received no timely notice of the investigative notes theory or the facts underlying it, which appear for the first time in the 2023 complaint. See Ingram, 524 F. App'x at 883; Staffing Advantage LLC, 2021 WL 2426340, at *8 (refusing to apply Ingram tolling to counterclaim party failed to bring in first complaint).

In addition, this new theory would not have related back to plaintiff's first complaint, lending further support for the conclusion that defendants did not have notice of these claims. In the Rule 15(c) setting, different legal theories on the same facts will generally, though not always, relate back to an earlier pleading, but courts view amendments that introduce or depend on substantially different facts with skepticism. See, e.g., Cannon v. Peck, 36 F.4th 547, 576 (4th Cir. 2022) ("nothing in the complaint alludes to the existence of, or claim related to, a third defamatory publication" (emphasis in original)); Grattan v. Burnett, 710 F.2d 160, 163 (4th Cir. 1983) (permitting complaint resting on same facts but invoking different statute to relate back); Cupertino v. Schneider, No. 92-2067, 1992 WL 369622, at *1 (4th Cir. Dec. 15, 1992) ("[b]ecause the [new claim] involved a different legal theory and rested on different facts than the [existing claim] . . . relation-back . . . is inapplicable"); Robinson v. Pytlewski, No. DLB-19-1025, 2022 WL 2359359, at *8 (D. Md. June 30, 2022) (discussing this principle in detail); 6A Wright & Miller, Federal Practice & Procedure § 1497 (3d ed. 2023) ("[a]mendments that go beyond the mere correction or factual modification of the original pleading and significantly alter the claim or defense alleged . . . are treated more cautiously").

The issue here is that the 2020 complaint contained no allegation that the officers manufactured any statements, but the 2023 complaint does, which forms the entire basis for the new theory. (See Compl. ¶¶ 103–04, 113–15; 2020 Compl. ¶¶ 179, 191–92). Thus, the 2023 complaint pleads crucial facts that form the whole basis for the new theory but which were absent from the first complaint. It therefore failed to provide notice of the claim and would not relate back.

In addition and in the alternative, plaintiff was not diligent in presenting this claim, because nothing prevented plaintiff from asserting this theory in 2020. See Staffing Advantage LLC, 2021

13

WL 2426340, at *8; see also Chao v. Va. Dep't of Transp., 291 F.3d 276, 283–84 (4th Cir. 2002) (discussing diligence under different equitable tolling standard).

In addition and in a second alternative, these allegations are not entitled to Fink tolling. Authority applying Fink suggests that the doctrine is limited to identical claims. See, e.g., Ingram, 524 F. App'x at 875, 879 (applying Fink tolling to plaintiff's second, identical complaint); Fink, 80 N.C. App. at 482–83; State v. Stevens, 266 N.C. App. 223, 224, 227 (2019) (prosecution by citation for two counts of vehicular homicide tolled limitations period for superseding prosecution by indictment for exact same charges arising from same incident).

The court ultimately concludes, on the basis of Ingram and relation back authority, that the investigative notes theory was not pleaded in 2020, meaning that the officers lacked notice of it, and/or plaintiff did not pursue it diligently, as required under Ingram, and/or it is not entitled to Fink tolling. Because this theory is therefore untimely, the court grants defendants' motion to dismiss it on statute of limitations grounds, in that part where it is used as a basis for both counts one and four.

Next, defendants challenge counts two and three of the complaint, on the same grounds. Here, the court disagrees. These counts in the 2023 complaint are for violations of procedural and substantive due process, and arise from the officers' use of manipulative interrogation techniques on Blackmon, and their concealment of exculpatory evidence. (See Compl. ¶¶ 179–212). These same allegations, presented under the same Constitutional provisions, and based on the same facts, appear in the 2020 complaint as well, in many instances verbatim. (See id.; 2020 Compl. ¶¶ 265–89). The 2020 complaint presents the now-two claims as one count, and contains some superficial differences, such as occasionally different paragraph order and some different heading labels.

However, these claims and the facts underlying them are presented in the 2020 complaint, meaning that defendants had timely notice of these claims, and Ingram tolling is appropriate.

In sum, the court concludes that the complaint is entitled to Fink and Ingram tolling as a general matter. However, plaintiff's investigative notes theory underlying the fabrication of evidence claim is not entitled to at least one of these tolling doctrines, and, therefore, is dismissed as untimely.

2.    Colorado River Doctrine

Defendants next argue that Colorado River abstention doctrine warrants dismissal on grounds that parallel state litigation between the parties renders this suit duplicative. The court disagrees.

Generally, a federal court "must" hear cases within its jurisdiction. McLaughlin v. United Va. Bank, 955 F.2d 930, 934 (4th Cir. 1992). However, in Colo. River Water Conservation Dist. v. United States, 424 U.S. 800 (1976), the Supreme Court established a narrow exception to this principle. In deciding whether to abstain in favor of duplicative parallel proceedings, the court considers 1) preference accorded to a first court assuming in rem jurisdiction; 2) relative importance of the state and federal fora; 3) need to avoid piecemeal litigation; and 4) relative order of the state and federal suits. McLaughlin, 955 F.2d at 934. Colorado River and its progeny have consistently emphasized that abstention is "exceptional," 424 U.S. at 818, and should be employed "only in the most extraordinary circumstances[.]" Gordon v. Luksch, 887 F.2d 496, 497 (4th Cir. 1989); see also McLaughlin, 955 F.2d at 934; Gannet Co., Inc. v. Clark Constr. Grp., Inc., 286 F.3d 737, 744 (4th Cir. 2002) (collecting cases).

As both parties acknowledge, a threshold question before the court even reaches those factors is whether parallel federal and state actions exist. Chase Brexton Health Servs., Inc. v.

Maryland, 411 F.3d 457, 463 (4th Cir. 2005). This requirement is "strictly construed," and abstention is improper if state and federal actions "differ in scope or involve different remedies." vonRosenburg v. Lawrence, 849 F.3d 163, 168 (4th Cir. 2017).

Here, the state and federal actions are not parallel. Plaintiff's state action does not include any federal constitutional claims, and presents emotional distress tort claims under North Carolina law that are absent here. (See generally State Compl.). The two actions are therefore not parallel as required under Colorado River doctrine, and abstention is improper. Defendants' motions are denied insofar as they seek dismissal on this basis.[5]

    3.    Qualified Immunity

Defendants assert qualified immunity as a defense to four of plaintiff's claims: 1) "fabrication of false inculpatory statements"; 2) "coerced confession"; 3) "conscience-shocking interrogation techniques"; and 4) "malicious prosecution and inadequate investigation." (See Holder Br. 12–13; Compl. ¶¶ 165–225). The court agrees that qualified immunity is appropriate for some of these claims, and does not reach the question on others.

Qualified immunity protects government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable would have known." Iko v. Shreve, 535 F.3d 225, 237 (4th Cir. 2008). A plaintiff thus must make two showings: a violation of a constitutional right, and that that right was "clearly established" at the time of the alleged conduct. Pfaller v. Amonette, 55 F.4th 436, 444 (4th Cir. 2022).

---

[5] Defendants also seek dismissal through the first to file rule, which permits a court to dismiss or consolidate actions when a prior suit is pending in which all issues could be tried with "equal facility." Carbide & Carbon Chem. Corp. v. U.S. Indus. Chem., 140 F.2d 47, 49 (4th Cir. 1944); see Hart v. Travelers Prop. Cas. Co. of Am., 610 F. Supp. 3d 785, 799–800 (E.D.N.C. 2022). However, the decision to apply the rule is made on a case-by-case, discretionary basis. See Hart, 610 F. Supp. 3d at 800. Because the two actions are both pending before the undersigned, the court declines, in the exercise of its discretion, to grant dismissal on the first to file rule.

Officials' actions violate clearly established rights only if their unlawfulness is apparent in light of preexisting law. Iko, 535 F.3d at 237–38. Under this standard, officials must show only the legal knowledge of an objectively reasonable official in similar circumstances. Id. at 238. Officials are liable for transgressing only "bright lines," not for "bad guesses in gray areas." Id. Finally, the Supreme Court has emphatically instructed that, for the purposes of this prong, rights must be established with a high degree of specificity, so that "existing precedent must have placed the [legal] question beyond debate." Kisela v. Hughes, 138 S. Ct. 1148, 1152–53 (2018). In making this determination, the court ordinarily looks only at the law as established by the Supreme Court, the Fourth Circuit and, in this case, the Supreme Court of North Carolina. See Booker v. S.C. Dep't of Corrs., 855 F.3d 533, 538 (4th Cir. 2017); Edwards v. City of Goldsboro, 178 F.3d 231, 251 (4th Cir. 1999). In the absence of directly controlling authority, the court may also consider a "consensus of cases of persuasive authority from other jurisdictions." Booker, 855 F.3d at 539.

Finally, although a defendant can assert qualified immunity at the pleadings stage, the defense is "usually not successful" at this phase, because a plaintiff need only provide sufficient detail about his claims to show a "more-than-conceivable chance of success on the merits." Owens v. Baltimore City State's Attys' Office, 767 F.3d 379, 369 (4th Cir. 2014).

The court turns to plaintiff's claims with this framework in mind.

a. Fabrication of Statements (Count One)

Plaintiff advances fabrication arguments under the two theories mentioned above: 1) that the officers outright manufactured incriminating statements Blackmon never made; and 2) the use of exploitative interrogation techniques upon the severely mentally ill Blackmon rendered the statements he made functionally fabricated. Count one of the complaint rests solely upon the

former theory, while count four rests upon both. (See Compl. ¶¶ 165–78, 213–25). Plaintiff accepts, and uses as the basis for plaintiff's argument on the merits, that count one rests solely upon this theory. (See Pl's Br. 19–22).

The court concluded above that the first theory is time-barred because no claim based upon it appeared in the 2020 complaint. Count one of the complaint therefore must be dismissed, and the court does not reach the merits of the claim or of defendants' qualified immunity defense.

b. Coerced Confession Claims (Counts Two and Three)

The facts and legal theories underlying count two in the complaint, labelled "coerced confession claim," and count three, labelled "conscience-shocking interrogation techniques," overlap: both accuse defendants of manipulating defendant's known mental illness to induce him to make false confessions. The court analyzes these claims together.

Defendants argue that Blackmon's confession was not coerced under the totality of the circumstances. (Holder Br. 21–25; Reply Br. 10 n.3). A voluntary confession is the product of an "essentially unfree and unconstrained choice by its maker." Schneckloth v. Bustamonte, 412 U.S. 218, 225–26 (1973). In contrast, "if [a suspect's] will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." Id. Further, interrogation techniques can offend due process when applied to "the unique characteristics of a particular suspect." Miller v. Fenton, 474 U.S. 104, 109 (1985).

Plaintiff does not adequately allege a coerced confession. The officers' interrogation was conducted in the open, and plaintiff does not point to any direct coercion, or to any promises or threats, but rather rests this claim upon the officers' intentional manipulation of the mentally ill Blackmon. (See Compl. ¶¶ 93–122).

18

The voluntariness of a confession is evaluated under the totality of the circumstances. <u>Rose v. Lee</u>, 252 F.3d 676, 685 (4th Cir. 2001). To make this determination, the court considers the characteristics of the defendant, the setting of the interview, and the details of the interrogation. <u>See</u> <u>United States v. Pelton</u>, 835 F.3d 1067, 1071 (4th Cir. 1987). Relevant to the inquiry are not only traditional tools of coercion such as direct violence, but also threats and promises of leniency or protection. <u>See, e.g.</u>, <u>Arizona v. Fulminante</u>, 499 U.S. 279, 287–88 (1991) (veiled threat to expose defendant to violence from other inmates rendered confession coerced); <u>Hutto v. Ross</u>, 429 U.S. 28, 30 (1976); <u>Watts v. Indiana</u>, 338 U.S. 49, 52–53 (1949) (extraordinarily prolonged interrogation rendered confession coerced); <u>Brown v. Mississippi</u>, 297 U.S. 278, 285–86 (1936) (physical violence and torture rendered confession coerced); <u>Rose</u>, 252 F.3d at 685–86 (summarizing these considerations).

These factors are all absent here. The setting of the interview and details of the interrogation all point towards voluntariness. The complaint contains no allegations that, for example, Blackmon's freedom of movement was restrained, that he was threatened, or that he was held for an excessive period of time. (<u>See</u> Compl. ¶¶ 93–122); <u>Rose</u>, 252 F.3d at 686; <u>Pelton</u>, 835 F.2d at 1073.

Plaintiff's mental illness certainly weighs in favor of coercion, but not dispositively so, and not enough to render Blackmon's confession coerced under the totality of the circumstances. <u>See, e.g.</u>, <u>United States v. Braxton</u>, 112 F.3d 777, 785 (4th Cir. 1997) (en banc) (noting that diminished mental capacity would point to coercion, but admonishing that "courts should not focus on a single factor"); <u>Correll v. Thompson</u>, 63 F.3d 1279, 1288 (4th Cir. 1995) (holding confession of defendant with IQ of 68 voluntary because no other circumstances pointed to coercion and he had prior experience with law enforcement); <u>Vance v. Bordenkircher</u>, 692 F.2d 978, 980–81 (4th Cir.

19

1982); Bone v. Polk, 441 F. App'x 193, 197 (4th Cir. 2011) (similar to Correll); see also Dassey v. Dittmann, 877 F.3d 297, 312–14 (7th Cir. 2017) (en banc) (holding confession, from intellectually limited and highly suggestible teenager, voluntary) cf. Sims v. Georgia, 389 U.S. 404, 407 (1967) (holding confession of defendant with limited mental capacity involuntary because he was cut off from friends and family, subjected to prolonged interrogation, and deprived of food); Gilliam v. Sealey, 932 F.3d 216, 236–37 (4th Cir. 2019) (holding that confessions by "serious[ly] intellectual[ly] disabled[]" suspects were involuntary in combination with numerous other factors, and reaching that conclusion "in light of all of the above"); United States v. Preston, 751 F.3d 1008, 1020–28 (9th Cir. 2014) (en banc) (holding that confession, from severely mentally handicapped suspect who had difficulty understanding basic words and phrases, when combined with threats and false promises of leniency, was coerced).

Plaintiff's complaint contains no factors pointing to coercion besides Blackmon's mental illness and the officers' exploitation of his suggestability; it lacks any allegations of, for example, threats, intimidating confinement, or promises of leniency. Plaintiff therefore does not plead an unconstitutionally obtained confession.

Plaintiff's cases do not undermine this determination. First, plaintiff relies upon Ferguson v. Boyd, 566 F.2d 873 (4th Cir. 1977). However, Boyd involved false promises to release a co-defendant who had been separated from her young children, plus retaliatory conduct for an initial refusal to confess involving police violations of state law. See id. at 877–78. Boyd does not resemble the circumstances here.

Second, plaintiff presents Blackburn v. Alabama, 361 US. 199 (1960). There, the police knew the defendant's history of mental illness and subjected him to a lengthy interrogation session. See id. at 204. However, Blackburn rested on the prolonged length of the interrogation, the closely

confined interrogation room "literally filled with police officers," and the deprivation of counsel in that setting. Id. at 204, 207–08. Blackburn did not depend on psychological manipulation of a mentally ill suspect, but rather these factors of intimidation.

Finally, plaintiff argues that Gilliam supports its coercion claim. But that case involved, again, numerous factors not present here, such as prolonged interrogation, death threats from the police, and the defendants being "tricked" into signing written confessions drafted by the police. See Gilliam, 932 F.3d at 236.

Plaintiff does not meet the burden to show that the officers' alleged interrogation tactics were unconstitutional. See Stanton v. Elliot, 25 F.4th 227, 233 (4th Cir. 2022) ("plaintiff bears the burden on the first prong [of qualified immunity]").

In the alternative, even if plaintiff had established a coerced confession in violation of due process, the officers' conduct was not clearly established to have violated that constitutional provision as of 1983, because neither side points to any precedent clearly prohibiting such conduct under these circumstances as of that year.

The officers are therefore entitled to qualified immunity against plaintiff's coerced confession claims.

        c.      Probable Cause (Count Four)

Finally, plaintiff pleads and argues that the officers' investigation was so inadequate that probable cause did not exist to arrest or prosecute Blackmon. (Compl. ¶¶ 213–25). The court concludes that the officers are entitled to qualified immunity on this claim.

Probable cause is a flexible, totality-of-the-circumstances test that turns on the assessment of probabilities in particular factual contexts. Illinois v. Gates, 462 U.S. 213, 231–32 (1983).[6]

---

[6]      Gates was decided June 8, 1983. The officers' actions occurred across the Autumn of 1983. (Compl. ¶¶ 91–131). Gates therefore governed all the actions at issue here.

Probable cause does not demand proof beyond a reasonable doubt, or that officers exhaust every exculpatory lead or resolve every doubt about guilt. Durham v. Horner, 690 F.3d 183, 190 (4th Cir. 2012); see, e.g., White v. City of Greensboro, 532 F. Supp. 3d 277, 318–19 (M.D.N.C. 2021) (rejecting attack on probable cause based on failure to pursue exculpatory leads); Smith v. Tilley, No. 2:17-cv-14-FL, 2019 WL 960602, at *5–6 (E.D.N.C. Jan. 17, 2019) (disputed hearsay supported probable cause).

Plaintiff's probable cause argument is, broadly, that various pieces of exculpatory evidence known to the officers should have defeated probable cause for Blackmon's arrest. In particular, plaintiff points to Blackmon's exclusion from the fingerprints found at the scene, his presence in New York around a month before and a month after the murder, and Kelly's statement that Blackmon did not look like the perpetrator. (See Pl's Br. 16–17). Plaintiff also points to allegedly fabricated and coerced statements attributed to Blackmon as discussed above. Finally, plaintiff presents the theory that Blackmon's statements amounted to fabricated evidence because they were procured through manipulation and exploitation of his mental illness. (See id. 18–19). The court examines each in turn.

First, Blackmon's fingerprints, his presence in New York, and Kelly's statements are unquestionably exculpatory. However, defendants convincingly argue that exculpatory and exonerating evidence are not necessarily the same thing. Kelly's statements did not "by operation of nature or law" exonerate plaintiff in 1983, but rather called into question the application of the perpetrator's description against Blackmon. See Massey v. Ojaniit, 759 F.3d 343, 355 (4th Cir. 2014). These pieces of evidence are, again, certainly exculpatory. But they are not exonerating, because they are insufficient to inherently defeat probable cause.

Second, the court has already concluded that Blackmon's statements were not alleged to have been obtained by coercion. Thus, Blackmon's statements to the officers actually support probable cause. See United States v. Dodier, 630 F.2d 232, 236 (4th Cir. 1980) (holding that uncoerced confession established probable cause).

Third, the court turns to plaintiff's fabrication theory. Plaintiff pleads that the officers attributed to him incriminating statements he never made, (see Compl. ¶¶ 104, 105, 113–15), and that Blackmon's mental illness rendered his false statements tantamount to fabrications by the officers. (See Compl. ¶¶ 108–112).

As discussed above, plaintiff's claim based on the theory that the officers manufactured statements Blackmon never made is time-barred, because it was not presented in the 2020 complaint.

Next, the court rejects plaintiff's argument insofar as it rests upon the notion that the officers' alleged manipulation of Blackmon into confessing amounted to fabrication of evidence. The court rejected this theory in the 2020 suit, (see Order (2020 Suit DE 56) 6), adheres to that ruling here, and therefore concludes that the officers' manipulation of Blackmon did not render his statements tantamount to fabricated evidence.

On the other side, supporting probable cause were the internal RPD communications informing the officers about the statements Blackmon had made at Dix, (see Compl. ¶¶ 68–74), and Blackmon's confession itself.

The court concludes that, considering all these pieces of evidence, and although the officers had significant exculpatory evidence, the officers did have probable cause to arrest Blackmon. Plaintiff's fourth claim for relief therefore fails insofar as it rests upon a failure to adequately investigate, or on a Fourth Amendment unlawful arrest theory.

23

Next, plaintiff's claim cannot rest upon the officers' concealment of Kelly's statements from the district attorney. Plaintiff's cases for this point all involved affirmative lies made to district attorneys which constituted the <u>sole</u> basis for probable cause. <u>See</u> <u>Humbert v. Mayor & City Council of Baltimore City</u>, 866 F.3d 546, 551–52, 556–57 (4th Cir. 2017) (affirmative lie that victim had positively identified assailant was sole basis for probable cause); <u>Miller v. Prince George's Cnty., Md.</u>, 475 F.3d 621, 626, 629–30 (4th Cir. 2007) (officer affirmatively provided incorrect information in warrant application without which probable cause did not exist).

But "[f]alse statements alone do not . . . run afoul of the Fourth Amendment . . . [t]o contravene the Constitution, the false statements or omissions must be material, that is, necessary to the finding of probable cause." <u>Ojaniit</u>, 759 F.3d at 357. Disclosure of the statements would not have defeated probable cause, as concluded above. <u>See</u> <u>Miller</u>, 475 F.3d at 628 ("if the . . . affidavit establishes probable cause [with the omitted facts inserted], no civil liability lies against the officer"); <u>see also, e.g.</u>, <u>Washington v. City of Chicago</u>, 98 F.4th 860, 874–79 (7th Cir. 2024); <u>Loftin v. City of Prentiss, Miss.</u>, 33 F.4th 774, 782 (5th Cir. 2022); <u>Paez v. Mulvey</u>, 915 F.3d 1276, 1287 (11th Cir. 2019); <u>Goodwin v. Conway</u>, 836 F.3d 321, 327 (3d Cir. 2016).

Finally, the claim cannot survive insofar as it rests upon the alleged use of fabricated evidence during investigation and prosecution, because this theory is time-barred as discussed above.

In sum, the court determines that qualified immunity bars plaintiff's second, third, and fourth claims for relief.

4. The City's Motion

Defendant City of Raleigh (the "city") moves for dismissal separately from the officers. (<u>See</u> City's Mot. Dismiss (DE 16)). However, the city's motion incorporates by reference all the

24

arguments made in the officers' briefs, and makes no independent points except one minor contention about the statute of limitations period which does not affect the court's conclusion on that issue.  (See City's Br. (DE 18) 2).  Because the city otherwise presents exactly the same arguments as the officers, its motion is resolved in the same manner on the same grounds.

     5.     Municipal Liability (Count Five)

Plaintiff presents a final claim for municipal liability against the city.  But the court has determined that plaintiff does not plead any viable claims against the officers, and a municipal liability claim cannot stand unsupported by any individual constitutional violations.  See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986); Grayson v. Peed, 195 F.3d 692, 697 (4th Cir. 1999), abrogated on other grounds by Kingsley v. Hendrickson, 576 U.S. 389 (2015).

In sum, plaintiff's complaint must be dismissed in its entirety for failure to state a claim upon which relief can be granted.  Plaintiff's allegations, taken as true, suggest deeply troubling police conduct.  However, these allegations are insufficient to state a claim under the Constitution.

## CONCLUSION

Based on the forgoing, defendants' motions to dismiss (DE 11, 16, 17) are GRANTED and all of plaintiff's claims are DISMISSED for failure to state a claim upon which relief can be granted, under Rule 12(b)(6).  The clerk is DIRECTED to close this case.

SO ORDERED, this the 11th day of September, 2024.


LOUISE W. FLANAGAN
United States District Judge

25